## Case No. 11,502.

### The QUEEN.

[8 Blatchf. 234.] 1

Circuit Court, S. D. New York.   Feb. 11, 1871. 2

COLLISION — STEAM AND SAIL — SAILING RULES —
CHANGE IN SCHOONER'S COURSE —
LIGHTS — LOOK-OUT.

1. A steamer and a schooner, more than half an hour after sunset, were approaching each other at a combined speed of fifteen miles an hour, upon courses nearly end on. The schooner had no lights set, and had no lookout exclusively employed in that duty, and did not see the steamer till within a short distance, (estimated by her so-called lookout at from one-half to three-quarters of a mile.) She was, nevertheless, seen from the steamer in time for any manoeuvre which the circumstances called for, and the steamer immediately ported and went off to starboard. After the steamer changed her course, and when the schooner was within 800 feet of the steamer, (when, if it was not clearly too late for the steamer, by any movement, to avoid a collision, it was in great doubt what movement was most likely to be effectual,) the schooner starboarded. Instantly, on seeing the change of the course of the schooner, the steamer threw her helm hard-a-port, and stopped and backed her engine, but a collision ensued, and the schooner was sunk. The steamer had all her lights set and burning brightly, and all proper officers on duty and in the exercise of vigilance. The pilot of the steamer, after testifying positively to a change in the course of the schooner across the bows of the steamer, after the latter had ported and shortly before the collision, stated, that he "saw the schooner's course, although she had no lights," and that "the want of lights did not contribute to the collision." *Held* that, although the rule required the steamer to keep out of the way of the sailing vessel, another rule, no less

---

1 [Reported by Hon. Samuel Blatchford. District Judge, and here reprinted by permission.]
2 [Reversing Case No. 11,501.]

stringent, required the sailing vessel to keep her course.

[Cited in The Free State, Case No. 5,090.]

2. The movement of the steamer was a prudent and proper movement. and was defeated by a change in the course of the schooner across her bows.

3. The steamer was in no fault.

4. The schooner was in fault in not having her lights set; also, in not keeping a proper lookout; also, in changing her course when very near the steamer, and thus defeating a proper effort of the latter to avoid her.

5. The testimony of the pilot of the steamer, that the want of lights on the schooner did not contribute to the collision, in connection with his testimony that he saw her change, did not relieve the schooner from liability, because, if the pilot judged correctly, then her improper change caused the collision, and if. (as was urgently insisted in behalf of the schooner), she did not change her course, then the want of lights plainly contributed to the mistake of the pilot and others on the steamer, and led to error in regard to the position and course of the schooner from the beginning, thus making the very case against which the rule requiring lights was intended to guard.

[Appeal from the district court of the United States for the Southern district of New York.

[This was a libel for collision. From a decree of the district court in favor of libelants (Case No. 11,501), claimants appeal.]

Edward H. Owen, for libellants.

Charles Donohue and John Chetwood, for claimants.

WOODRUFF, Circuit Judge. The question in this case is purely one of fact. The proof shows, without contradiction, that, in the evening of October 13th, 1866, the schooner Mary Ann Magee was on her voyage southerly from the harbor of New York, after sunset and with no lights set, and that the steamer Queen was approaching that harbor, and that they came into collision, the steamer striking the schooner on her starboard side, near amidships. by a blow "angling aft," causing such injury that the schooner sank.

The rule of law governing the conduct of a steamer and a sailing vessel when approaching each other from opposite or nearly opposite directions, is not in any dispute or doubt. The steamer is bound to keep out of the way of the sailing vessel, and the latter is bound to keep her course. The conflict of evidence in this case relates to two questions—first, the respective bearings of the two vessels from each other, as they approached; and, second, did the schooner keep her course, or did she, by starboarding, defeat the endeavor of the steamer to keep out of the way?

(1) Upon the first point, I think the testimony very satisfactorily establishes that the vessels were approaching each other very nearly head on. It is true, that the master of the schooner expresses a somewhat faint opinion, that, when he first saw the steamer, she bore from one and a half to two points on his starboard bow; but his observation was a very unsatisfactory one. He was at the helm. He could only see the steamer by looking under the main boom. He, under the pressure of the responsibility cast on him by the fact of collision, and under the influence of a strong, though natural, desire to exonerate himself, is able to say that he "thinks she bore one and a half to two points on their starboard bow." His alleged lookout. who alone sustains him, testifies almost in the words of his master, so nearly so as to awaken distrust; and yet he, while he did, in the first instance, swear in the very words of the other, afterwards modified it to "rather on starboard bow," and, again, "she bore ahead, if anything on starboard bow, but pretty much ahead," and, further, that he saw all three of the steamer's lights, which indicated conclusively that the steamer was bearing directly towards the schooner. On the other hand, a large number of witnesses from the steamer, master, mates, pilot and seamen, declare, that the schooner was directly ahead or a little on their port-bow. The course of the two may not have been exactly coincident. The schooner's witnesses make her course from south to south by west, though her master, who alone knew anything about it, gives this only as an opinion, under the saving, that he "thinks" that was her course; and the course of the steamer would seem to have been from north to north half east. Upon all this, my conclusion is decided, that the vessels were approaching very nearly head on, and that the steamer was not seen, before either changed her course, materially over the starboard bow of the schooner, and did not, before such change, open on that bow. Nor, on the other hand, was the schooner, before the steamer ported, materially on the port-bow of the steamer, though, if that were a turning point in the case, I should be constrained to say, that the preponderance of the evidence is, that the schooner bore, when first seen, a little over that port-bow. The result of this is, however, only to show two things—first, that they were approaching each other so as to require the steamer to keep out of the way and the schooner to keep her course; and, second, that the steamer was not approaching the schooner in a course leading to the westward of the schooner, in such wise that the subsequent porting of the steamer to pass to the eastward was an obviously unskilful and improper movement.

(2) Upon the second question—did the steamer take proper measures to keep out of the way, and were those measures defeated by the change of the course of the schooner to the eastward?—the chief contest on the hearing was exhibited; and, in that contest, the conduct of the schooner in respect to lights and look-out became of some importance, from its bearing. first. on the propriety of the conduct of the steamer, second. on the broader question of fault in the schooner, and, third, on the credibility of the

witnesses from the schooner and the weight of their testimony.

If it be true that the vessels were approaching head on or nearly so, it is entirely clear that it was proper, and agreeable to the dictate of the best judgment, for the steamer to port, as she did. If weight is given to the testimony of her witnesses, that the schooner bore on her port-bow, then, what she did was so clearly proper, that she might have been condemned for bad seamanship had she done otherwise. She ported, and fell off to the eastward, immediately on seeing the schooner. The proof is ample, that she was in the exercise of the highest diligence, every man at his post, master, mates, pilot, wheelsman, and others, two men on the look-out, with a mate also on the bow, specially charged with the duty of looking out, and all these agree in their testimony to what they saw and to what was done. I think it well established, that, in the respective bearings of the vessels and in full recognition of the obligation of the steamer to keep out of the way, her porting, when she saw the schooner, was a wise and proper movement. If the schooner did not change her course, then the inference would be inevitable, that this conclusion and the testimony tending to support it are erroneous; but, if she did change, in such wise as to defeat a proper movement to avoid her, then the collision must be deemed the fault of the schooner.

That the schooner changed her course to the eastward is sustained by all the testimony which tends to show that she was seen from the steamer on the port-bow or the latter, or directly ahead, and, also, by the testimony of McDaid, from the schooner, to his first seeing the steamer nearly ahead and seeing all her lights; for, if their respective courses were as testified and as assumed throughout the trial, they could not, by any possibility, have come together, being so seen, unless the schooner also changed her course to the eastward. That she did so change her course is also expressly testified by not less than six witnesses. The contrary rests upon the testimony of only one. It is true, that, in judging of a conflict of evidence on such a subject, mere excess of the number of witnesses is not controlling; but it is entitled to large consideration, and should control, unless it very clearly appears that the one witness, for some special reason, is more entitled to credit. In this precise view, it is here claimed, that the one witness from the schooner, being himself at the helm, knows, beyond all peradventure, that he did not change his course, while the witnesses to the contrary, being on a moving object, may have been deceived by the motion of their own vessel. That is often true, but it is not applicable here to the extent claimed, for this reason. It is not doubted that the steamer did, in fact, port her helm, and go to the eastward. How could that motion tend to make the schooner ap-

pear to their eyes to move also to the eastward? Approaching as the vessels were, every instant of the steamer's movement eastward, if the schooner kept her course, would give to the eyes of an observer on the steamer the impression that the schooner was passing more and more to the westward. The argument reverses the effect of such a change; for, obviously, to an eye on a vessel moving east even a stationary object seems to move west, so that, even to inexperienced observers, if the vessel on which they stand is moving eastward, a sudden change in their view of another vessel, by which, instead of moving westward, she seems to move eastward, is a pretty decisive indication that she has changed her course to the eastward. But, here were old and experienced mariners—the master, of long experience and nautical skill—the pilot, whose whole life is devoted to the exercise of judgment and skill in observation on this coast and in the place of observation—the other officers of the steamer, of long experience, &c. These are not lightly to be judged in error on the point. If the testimony of so large a number, and from such witnesses, is to be deemed overcome by that of one witness, wholly uncorroborated, it would follow that a single witness so situated might, however false, exonerate himself from blame and compel indemnity to his owners for his own error, with hardly a chance to the other party of obtaining protection. It is much more probable, in this case, that, conscious that he did not see the steamer so soon as he should, conscious that he had no look-out attending to the duty, conscious, perhaps, that he was late in setting his lights, and seeing the steamer near, as, in fact, she was, before he saw her, he made the change in a mistaken judgment, the consequence of which he would now avoid.

This brings into view the evidence of want of vigilance, care and seamanship on the schooner, which very properly bears upon the truth of the testimony of her master, who stands alone on the other point, and also bears strongly on the effort to impute fault to the steamer. The steamer was approaching with all her lights set and burning brightly, and yet she was not seen at all on the schooner, until discovered by the master, then at the helm, by his looking under the main boom, and she was then so near, that the master states his opinion, which, in view of all that occurred, leaves little doubt on my mind that she was much nearer, namely: "I can't tell exactly, I should think, probably, she might have been half a mile or a mile; can't tell much, on the water, about distance." This, at least, shows that his estimate is of little value. His professed look-out gives his opinion, that, when he saw the steamer, she was a half or three quarters of a mile distant. Now, the combined speed of the two vessels was about fifteen miles an hour, and, at a half a mile distance, they

would, if they did not change, come together in two minutes. It is a significant fact, that, while the three witnesses from the schooner, to excuse their own want of lights, testify that a vessel without lights could be seen, one says, two miles, others, one mile, no one saw this steamer, with all her lights burning and in full view, and coming in the direction to which their uninterrupted attention should have been directed. It is not only shown that they did not see the steamer when they ought to have seen her, but that the representation of the master, the correctness of whose testimony in other respects is of chief importance, is calculated to deceive, and, I think, was intended to mislead, in respect to his in fact having any look-out. He swears that McDaid was forward as look-out, when, in truth, McDaid was busy at other things; and I think it very plain that he had been busy at other things from the time the schooner sailed that evening. When the master made that statement, he certainly knew that McDaid was not in fact acting as look-out and did not see or report the steamer at all; and, on cross-examination, he is compelled to admit it. I think the whole testimony of the master himself indicates that he knew McDaid was busy assisting in setting sails, securing the anchor, and coiling ropes —services which were incident to the resumption of their voyage. McDaid himself removes all doubt. He states, that they had finished making sail, and had taken in the anchor, and then went to coiling ropes, and that the man that was drowned and he were at this when he saw the steamer; and he says the vessels were then heading about for each other, going up and down mid channel, and he saw all three lights. However true it may be, that, if the schooner was in no other fault, and, if, in fact, she kept her course, her want of look-out could not affect the duty of the steamer to keep out of the way, or tend to produce the collision, which is, of itself, pretty narrow ground upon which to claim exemption, and would only in very special cases, if at all, save a vessel from contribution, this evidence bears significantly upon the weight to be given to the schooner's witnesses and the degree of care, skill and competency to be accorded to them.

The question whether the schooner was not in fault in not having her lights set is of even greater importance. The very effort made by the schooner to prove that a vessel without a light could, at that time of the evening, be seen a mile, is a recognition that her want of lights was a violation of the rule requiring lights which could be seen not less than two miles in a dark, clear night. When congress required sailing vessels to carry colored lights, which, in a clear, dark night, can be seen at least two miles, it is absurd to say that it was no fault to be without lights, if the vessel can be seen one mile. But this is not all. The sun had been down one half an hour, if not nearly an hour, it was, even tak-

ing the time most favorably for the schooner, a dim twilight, in which the trim of her sails would be least distinct and clear to the view, against a gray horizon, and the express words of the act of congress require that the lights shall be exhibited from sunset to sunrise. No clearer case of fault in a particular of great importance to her safety, or of more stringent duty to the approaching steamer, can be stated. The testimony of the pilot of the steamer, that he "saw the schooner's course, although no light," and that "want of lights did not contribute to the collision," does not, in the least degree, tend to save the schooner from the imputation of fault. The pilot, himself a mariner of experience and skill, is positive that he saw the schooner change her course to the eastward, across the bow of the steamer, after she had ported to avoid the schooner. He, therefore, necessarily inferred, that, if the schooner had lights, it would have made no difference, for he could then only have seen what he did in fact see. If the libellants concede that he was right in this, then the claim of the steamer in this regard is conceded. But, on the other hand, if it be claimed, as it is, that the master, pilot, officers and seamen of the steamer made a mistake in supposing that the schooner starboarded, the very case is made which the statute was intended to guard against, and which the schooner was bound to guard against, by having her lights set. The schooner either starboarded and crossed the bows of the steamer, as the witnesses testify, or the want of her lights operated directly and effectively to mislead them and prevent their judging correctly of her movements.

It is, however, earnestly insisted, that, if it be deemed true that the schooner changed her course, that did not relieve the steamer from her duty to keep out of the way, because she still had time and distance within which it could have been done. This proposition, applied to the present case, is this: Although the steamer saw the schooner, and, on seeing her, ported, taking the appropriate means to avoid her, yet, when the schooner, after that, starboarded erroneously, and without any proper reason, defeating the object of the steamer in porting, it was the duty of the steamer to take such measures thereafter as would avoid the collision. The schooner, making such faulty movement, interfering with the proper effort of the steamer to avoid her, must make a very clear case of subsequent fault in the steamer, before she could even claim contribution. The proof here is, that, so soon as the schooner was seen from the steamer, the latter ported, to avoid her; and that, when within a short distance, the schooner starboarded and crossed the bow of the steamer. The distance of the schooner from the steamer, when she thus starboarded, is variously estimated by the witnesses; but, a fair view of the whole evidence would make it not over 800 feet, and, I think, rather less. That is little over twice the length

of the steamer, and the engine of the steamer was then instantly stopped and backed, the helm being thrown hard-a-port, to sheer her off to the·east as far as possible. The claim is, that the steamer should have starboarded. The vessels were approaching each other at a combined rate of from 13 to 15 miles an hour, or one mile in about four minutes, and 800 feet in little over half a minute. Looking back, and seeing precisely what took place. it may seem, that, if the steamer had starboarded, she might have cleared the schooner; but that is not the standpoint from which the view is to be taken. The schooner was approaching the course of the steamer, which made a change to port or westward perilous, the captain and pilot deemed it impracticable, the schooner was little over two lengths of the steamer distant, the time within which to effect a change was little over half a minute, and they then thought, and still think, throwing the helm hard-a-port, and stopping and reversing, the only alternative which promised either to avoid collision or diminish the force of the blow. In this condition of peril, I think their judgment should be accepted, and that, in fact, they acted prudently.

The conclusion is inevitable. The collision was the fault of the schooner, and the libel of her owners must be dismissed, with costs. See [Case No. 11,501].